

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

SA:AS/LKG
F#: 2015R01810

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

December 6, 2016

By Hand and ECF

The Honorable Marilyn D. Go
United States Magistrate Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

> Re:   United States v. Edward Carrillo, et al.
>       <u>Criminal Docket No. 16-617 (BMC)</u>

Dear Judge Go:

The government respectfully requests that the Court order all of the defendants to be permanently detained pending trial of this case. All of defendants have been indicted for narcotics offenses carrying mandatory minimum sentences ranging from 10 to 20 years; some defendants are facing the prospect of spending the majority of the rest of their lives in prison. The strong incentive to flee alone means that the defendants cannot rebut the statutory presumption that they pose risks of flight. Nor can the defendants—many of whom have disturbing criminal records—rebut the presumption that they pose dangers to the community.[1]

I.     <u>Background</u>

For approximately two years, the Drug Enforcement Administration ("DEA") and the New York City Police Department ("NYPD") have conducted an investigation into a large narcotics conspiracy operating in the Queensbridge Houses ("Queensbridge"), the largest public housing development in the United States. Queensbridge has had a substantial history of violence and narcotics trafficking. In February 2005, the DEA and NYPD arrested

---

[1] ███████████████████████ Mohamed Saleh, also known as "Arab," and Shamar Stallworth, also known as "Black," were also arrested during the comprehensive takedown of this case and have been charged by the Queens District Attorney's Office for narcotics trafficking in and around the Queensbridge Houses.

dozens of individuals—mostly members of the Bloods street gang—for selling cocaine in Queensbridge as well as for firearm charges and acts of violence. Some of the defendants, including Carrillo, were prosecuted in this District for violations of 21 U.S.C. §§ 841 and 846, United States v. Carrillo, et al., Criminal Docket No. 05-205 (SJ); others were prosecuted by the Queens County District Attorney's Office. In May 2013, the Queens County District Attorney's Office indicted 28 more individuals, including ones that resided in Queensbridge for selling heroin, cocaine, oxycodone, methamphetamine, and marijuana.

The most recent investigation has focused on crack and pill conspiracies conducted by the defendants, all but two of whom traffic narcotics in and around Queensbridge. All of the defendants have been indicted for narcotics-related offenses that carry severe mandatory minimum sentences either for (1) participating in a crack conspiracy involving more than 280 grams of crack or (2) for distributing at least 400 grams of a substance containing Fentanyl and causing at least one death. In the case of Carrillo and Monroe, they are charged with both conspiracies, subjecting them to potentially consecutive sentences for the death of the victim stemming from the pills conspiracy (20 years) and for their role in the crack conspiracy (10 years). Three of the defendants—including Carrillo and Monroe—have also been indicted for an attempted Hobbs Act robbery.

A.    Crack Conspiracy

The predominant drug trafficked in Queensbridge is crack cocaine. Crack cocaine sold by five of the defendants during "controlled buys" to a confidential informant ("CI") and undercover agent ("UC"). Wire interception of Monroe's and Carrillo's telephones revealed the impressive speed with which the co-conspirators moved large quantities of this dangerous and addictive drug.[2] Monroe's telephone line in particular, which was intercepted from March through May of 2016, was filled almost exclusively with individuals—including the defendants—calling to obtain distribution-level quantity of crack that could immediately be injected into the Queensbridge community.

For example, in one text message, an individual told Monroe that he "flew" through 5 grams of crack cocaine (worth hundreds of dollars) and needed to be re-supplied immediately to make money: "how we gonna fuc wit each other u keep giving me five I fly threw that then have nothing after that I am not getting no bread." Another individual asked Monroe, "you think you could shoot back for another 14?"—a reference to 14 grams of crack.

As set forth in more detail below, Carrillo, Monroe, ███████ ██████ Carmichael, and Young have all been charged in the crack conspiracy. All of these defendants have been intercepted on the telephone participating in a crack conspiracy with

---

[2] The government hereby provides notice to the defendants pursuant to 18 U.S.C. § 2518(9) of its intent to rely on wiretap interceptions at the detention hearing in this case. In order to preserve the integrity and confidentiality of the government's investigation, notice to the defendants of the wiretap interceptions prior to their arrest was not feasible. All of the quotes from wiretaps contained in this letter are in draft format.

Monroe, and, with the exception of Carrillo, have also sold crack on multiple occasions directly to a CI and/or UC.  Carrillo, for his part, has already been indicted once in this district for his role in a Queensbridge crack conspiracy.  Carrillo's telephone was separately wiretapped, which produced additional evidence against him, involving the trafficking of cocaine.

C.    Pill Conspiracy Resulting in Death

While crack was the drug of choice for distribution in Queensbridge, Carrillo, Monroe, ▮▮▮▮▮▮ supplemented their income in a separate conspiracy to distribute illicit pills, including Fentanyl.  Their sales led to the death of at least one person—a young woman and a mother who died of an overdose from Fentanyl.  All three defendants knew about the death but continued their conspiracy, sending at least two more large packages of Fentanyl to West Virginia—packages that the DEA later seized.

The wiretaps on Monroe's and Carrillo's telephones show the significant volume of pills that the defendants sent to West Virginia.  For example, on April 4, 2016, before Monroe traveled to West Virginia, Carrillo told Monroe that he would send "3,000 . . . for you . . . just next day them . . . so you don't gotta travel with them."  Monroe then began arranging his travel with ▮▮▮▮▮▮ who lived in West Virginia, and obtaining an address where Carrillo and Monroe could send the pills.  Once ▮▮▮▮▮ provided the address ("100 Church Lane apt g 9 princeston WV 24740"), Monroe forwarded it to Carrillo.

On April 16, 2016, about two days after Monroe arrived in West Virginia, he called Carrillo to report that the pills they had sold killed a young woman.  "We're having problems, man," Monroe told Carrillo, because "the people that sniffed it liked it, but the people that banged it . . . shot the shit, they ain't like it."  In addition to their consumers' preferences, Monroe told Carrillo about the death: "I tried to hit another n**** with them, and the girl went out."  When Carrillo asked what Monroe meant by "went out," Monroe left no ambiguity that a young woman had died on or about April 15: Went out! OD—OD . . . But, the n**** that sniffed the shit liked it. He said the girl fucking . . . was doing shit yesterday [April 15, 2016] and she passed away, bro . . . of them shits."  Carrillo was disappointed with the death because he was "hoping you could take shits slow."  The two men decided that their business would do better if they could provide pills that were not coated, and were encouraged that ▮▮▮▮▮▮ was still actively selling the pills in the West Virginia community.

The death of the young woman did not slow down the conspiracy.  Monroe promised a major payoff for Carrillo because some of the local distributors, he told Carrillo, had $60,000-70,000 ready to spend on the defendants' product.  They are going to "fucking feed up the projects," Monroe proclaimed.

About two weeks after the death of the victim, on May 5, 2016, Monroe sent ▮▮▮▮▮▮ yet another package containing pills.  This package, however, did not reach its intended destination and was eventually seized by the DEA.  On May 12, 2016, Monroe sent ▮▮▮▮▮ a second package.  Unfortunately for the co-conspirators, Monroe misaddressed

both packages, which contained about 900 pills. Their chemical composition—containing Fentanyl and Acetaminophen—matched the substances found in the victim's system by the medical examiner. Phone toll analysis and witness interviews confirmed that it was the defendants' pills that killed the victim.

D.    Attempted Hobbs Act Robbery



The same defendants who trafficked in the pills (Monroe, Carrillo and █████████) also conspired and attempted to commit a Hobbs Act robbery by stealing about $110,000 of narcotics proceeds from an individual they believed to be traveling across state lines. On March 30, 2016, █████████ called Monroe to tell Monroe that another drug dealer in West Virginia had about $110,000 stolen from his truck, and that the perpetrator was traveling by bus to the tristate area. █████████ asked Monroe to "intercept that n****, when he get off the bus." Monroe agreed and said that he would recruit Carrillo to come with him.

Monroe immediately called Carrillo and asked him to come with him: "I am going to meet you, and we going to go over there. . . . Fuck these n****s." Carrillo asked Monroe if he wanted a gun: "You want me to bring the thing?" Monroe said he already had one, and that they should plan to go to the Chinatown terminal. █████████ reassured Monroe that the intended victim did not have a gun: "shit he ain't got no bang on him, so he can't act crazy, he's naked as fuck," to which Monroe responded, "I am about to turn it up."

To prevent risk of injury or death, the NYPD began conducting surveillance, which Monroe apparently detected: "You know that black car keeps circling and circling and I'm trying to see something for a second." Ultimately, Monroe, Carrillo, and others waited but the intended victim never came. Monroe told ███████ the next day that they were all in position, armed, and ready to commit the robbery: "we had biscuits, stun guns, all that shit . . . . we would a taken him down my n****," but he never came.[3]

II.    Legal Standard

The Bail Reform Act directs courts to order a defendant detained pending trial if "no condition or combination of conditions would reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). In cases like this one, involving specified violations of the Controlled Substances Act, "it shall be presumed," subject to rebuttal by the defendant, "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community." 18 U.S.C. § 3142(e)(3).

---

[3] Notably, Monroe used "biscuits" to refer to guns on another occasion during the interception period. In a May 3, 2016 call, Monroe stated, "That's how it all started, it started from.. son was making a move and son said, this nigga seem him--they started beefing with him about it and pulled the biscuit out him."

The presumption means that the Court must initially assume there is "no condition or combination of conditions that will reasonably assure the appearance of the person as required and the safety of any other person and the community." Id. The defendant must come "forward with evidence that he does not pose a danger to the community or a risk of flight." United States v. Mercedes, 254 F.3d 433, 436 (2d Cir. 2001). Even if the defendant were to meet his burden of production, "the presumption favoring detention does not disappear entirely, but remains a factor to be considered among those weighed by the district court." Id.

Four factors guide the Court's determination of whether the defendant should be released on bail: (1) the nature and circumstances of the crimes charged, "including whether the offense is a crime of violence . . . . or controlled substance [offense]"; (2) the "weight of the evidence against" the defendant; (3) the "history and characteristics" of the defendant; and (4) the seriousness of the danger posed by the defendant's release. See 18 U.S.C. § 3142(g).

Evidentiary rules do not apply at detention hearings, and the government is entitled to present evidence by way of proffer, among other means. See 18 U.S.C. § 3142(f)(2); see also United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000). In the pretrial context, few detention hearings involve live testimony or cross-examination. Most proceed on proffers. Id. at 131. This is because bail hearings are "typically informal affairs, not substitutes for trial or discovery." Id. (internal quotation marks omitted); see also Mercedes, 254 F.3d at 437 ("[The defendant] has twice been convicted of weapon possession—one felony conviction, and one misdemeanor conviction. We find the district court committed clear error in failing to credit the government's proffer with respect to [the defendant's] dangerousness.").

III.   Argument

All seven of the defendants are flight risks because they face strong cases and long mandatory minimum sentences. But it is not just the incentive to flee prosecution that makes the defendants unbailable; each one also presents a danger to the community, as they are likely to reengage in narcotics offenses and most have exhibited violent behavior in the past. The risks that each defendant presents is discussed in more detail below.

A.   Edward Carrillo ("Super Ed")

Carrillo is charged in every count in the indictment. He participated in the crack conspiracy (resulting in a 10-year mandatory minimum sentence), a pill conspiracy involving more than 400 grams of fentanyl (10-year mandatory minimum sentence) and resulting in a death (20-year mandatory minimum). He also participated in a Hobbs Act robbery conspiracy (a Guidelines sentence of about 70-87 months). His exposure in this case means that, at age 43, he is facing the prospect of spending the rest of his life in jail.

5

That alone is sufficient to detain Carrillo.  See, e.g., United States v. English, 629 F.3d 311, 321-22 (2d Cir. 2011) (affirming detention in part because the defendant faced a presumption against release, and a mandatory minimum sentence that incentivized fleeing); United States v. Henderson, 57 F. App'x. 470, 471 (2d Cir. 2003) (summary order) ("the presumption regarding flight risk has changed because [the defendant] now faces a ten-year mandatory minimum sentence"); United States v. Dodge, 846 F. Supp. 181, 184-85 (D. Conn. 1994) (possibility of a "severe sentence" heightens the risk of flight).  Even electronic surveillance and home confinement are not sufficient to guard against flight.  See United States v. Orena, 986 F.2d 628, 632 (2d Cir. 1993) ("electronic surveillance systems can be circumvented by the wonders of science and of sophisticated electronic technology") (internal quotation marks omitted).

Carrillo's incentive to flee is particularly concerning because the evidence against him comes, in large part, from his own words captured over wiretap recordings.  As a result, Carrillo will be hard pressed to distance himself from either of the narcotics conspiracies.  He has been intercepted discussing pills and crack over his own telephone line as well as over Monroe's, including a conversation with Monroe about the death of a young female from the pills that Carrillo supplied to Monroe and ███████  Carrillo also issued directives to Monroe and ██████ when Monroe realized that he had misdirected one of the packages of pills: "fucking get him on it over there.  You gotta holla at him now, time is of the essence, bro."

Carrillo is no stranger to the federal system, having served a five-year sentence in the 2005 Carrillo case mentioned above, in which he was the lead defendant.  In that case, Carrillo was identified as a member of the "Dream Team," which was a set of the Bloods street gang trafficking crack in Queensbridge and employing violence to protect its turf.

Aside from posing a flight risk, Carrillo is also a danger to the community for two reasons.  First, he is likely to reengage in his profitable narcotics conspiracies, which appears to be his only livelihood.  As the Second Circuit has made clear, the concept of "dangerousness" encompasses not only the effect of a defendant's release on the safety of identifiable individuals, such as victims and witnesses, but also "'the danger that the defendant might engage in criminal activity to the detriment of the community.'"  United States v. Millan, 4 F.3d 1038, 1048 (2d Cir. 1993) (quoting legislative history).  Significantly, dangerousness includes "the harm to society caused by [the likelihood of continued] narcotics trafficking."  United States v. Leon, 766 F.2d 77, 81 (2d Cir. 1985).  Carrillo—who has been arrested as a young man in 1999 with crack cocaine—has demonstrated that not even a serious federal indictment will deter him from trafficking the same drugs, in the same area.

Second, Carrillo is a danger to the community because he has demonstrated a readiness to rob someone at gunpoint.  As described above, Carrillo is charged with conspiring and attempting to commit a Hobbs Act robbery.  In preparing for that robbery, Carrillo asked Monroe whether he should bring a gun.  This conduct is concerning in part

6

because in 1993, Carrillo was arrested for murder, stemming from allegations that he shot a victim in the face.

B. Johnnie Monroe ("Nut")

Like Carrillo, Monroe is charged in every count of the indictment. He headed the day-to-day operation in Queensbridge that pumped thousands of dollars' worth of crack cocaine into the public housing community. He was also the main force behind the pill conspiracy, which led to the death of a young woman. Even after learning of the death, Monroe continued to suggest to Carrillo how more pills could be sent and sold in West Virginia, so that, as he put it, the pills could "fucking feed up the projects." Finally, Monroe directed the efforts to rob at gunpoint an individual he believed to be carrying cash on a bus heading for New York.

Like Carrillo, Monroe is a middle-aged man who will likely spend the majority of the remainder of his life in prison. At a minimum, he will be sentenced to 20 years, and he could face decades more if the sentences on the unrelated counts are imposed consecutively, which the district court will have ample discretion to do.

The evidence against him is irrefutable. He has sold crack cocaine during video-recorded controlled purchases. His telephone line was replete with calls of him re-supplying distributors of crack, directing the pill conspiracy, and planning the robbery. His fingerprints were lifted from one of the misdirected packages containing the same type of pills that killed the young mother in West Virginia. In short, Monroe has no incentive to follow through on a case that will lead him into, in practical terms, a potential life sentence. He has already shown a propensity to miss court appearances as he has had multiple bench warrants entered against him in state court.

Monroe is also a danger to the community. He has had a history of weapon convictions and arrests. In August 2007, he was sentenced for unlawful gun possession. In April 1991, he was arrested for shooting a victim in the leg during a verbal altercation. In June 1989, he was sentenced for gun possession because shot a gun from a roof, striking a victim in the face. That same year, Monroe was also sentenced for cutting an inmate in prison with a razor. As the charges in this case show, Monroe has not gotten any less dangerous with age. He has been indicted for organizing a group of co-conspirators to rob an individual at gun point. As he boasted to ███████ in one of the calls, the group had guns and was ready to act. Thus, not only does Monroe pose a flight risk, but he is also too dangerous to be released pending trial.

C. ████████████████





      D.                    Terrell Carmichael ("Rell"), Michael Young ("Littles") and

The remaining four defendants are all affiliated with the Bloods gang and are charged in the crack conspiracy, which carries a 10-year mandatory minimum sentence. Each one of these defendants has sold crack cocaine to a CI and a UC on multiple occasions. Young, for example, has sold crack during undercover operations about 20 times, for a total of approximately 32 grams. Every defendant has also been intercepted on Monroe's telephone discussing the crack conspiracy and police presence. Typical calls and text messages included, "let me get 2.5," meaning 2.5 grams of crack cocaine (a distribution quantity), "I need five man," and "be careful, them D's riding around too" (meaning, be vigilant of the police).

The strength of the evidence, the mandatory minimum sentences, and the legal presumption against their release, are alone sufficient to detain the defendants. See, e.g., English, 629 F.3d at 321-22 (affirming detention in part because the defendant faced a presumption against release, and a mandatory minimum sentence that incentivized fleeing); Dodge, 846 F. Supp. at 184-85 (possibility of a "severe sentence" heightens the risk of flight).

But there is more. All four of the defendants have checkered pasts—filled with narcotics-related convictions, violent behavior, and bench warrants—that make their pre-trial release particularly risky and dangerous. Young has been incarcerated at least four times, including for narcotics-related offenses. Prior to one arrest, he swallowed a substantial amount of crack cocaine to conceal it. He was also sentenced as recently as June

2015 for a narcotics offense.  Young's record also reflects convictions and arrests stemming from violent behavior.  In May 2005, for example, he was sentenced to three years for robbing and assaulting two victims.  In June 2008, he was arrested for shooting at another victim.  In December 2000, he was arrested for assault and robbery.  And in July 2008, Young and ████████ were both arrested for shooting at a person.



Carmichael has had the most extensive narcotics-related history of any defendant, having a record of at least eight such convictions.  The risk of his re-offending if released is therefore substantial.  See Leon, 766 F.2d at 81 ("[I]t is clear that the harm to society caused by narcotics trafficking is encompassed within Congress' definition of 'danger.'").  He has also been arrested for violent behavior, including punching and robbing victims in November 2007 and August 2003.  And like some of the other defendants, Carmichael has had multiple bench warrants issued against him, in at least three different cases.  Given the evidence against him, the sentence he faces, and a prior history of failing to appear in court, Carmichael presents an unacceptable risk of flight and danger to the community.



In short, ████████ Young, Carmichael, and ████████ are all facing 10 years in prison for a crack conspiracy based in part on evidence that will be difficult to dispute: controlled purchases and a wiretap.  In addition, each one has either a serious criminal history, a history of failing to appear in court, or both.  Those facts, in addition to the legal presumption against release is more than sufficient for the Court to enter a permanent order of detention.

IV.    Conclusion

                For the reasons given above, the defendants cannot rebut the statutory presumption that they present a risk of flight.  Accordingly, the government submits that the Court order the defendants permanently detained pending trial.

                                        Respectfully submitted,

                                        ROBERT L. CAPERS
                                        United States Attorney

By:                   /s/
                                         Andrey Spektor
                                         Lindsay K. Gerdes
                                         Assistant U.S. Attorneys
                                         (718) 254-6475/6155

cc:   Defense Counsel, Esq. (by ECF)
       Clerk of the Court (BMC) (by ECF)