1

1   UNITED STATES DISTRICT COURT
    EASTERN DISTRICT OF NEW YORK
2   ---------------------------------x
                                        16-CR-617(BMC)
3   UNITED STATES OF AMERICA,
                                        United States Courthouse
4            Plaintiff,                 Brooklyn, New York

5            -against-                  December 7, 2017
                                        10:00 a.m.
6   MICHAEL YOUNG,

7            Defendant.

8   ---------------------------------x

9           TRANSCRIPT OF CRIMINAL CAUSE FOR SENTENCING
               BEFORE THE HONORABLE BRIAN M. COGAN
10                UNITED STATES DISTRICT JUDGE

11  APPEARANCES

12  For the Government:        UNITED STATES ATTORNEY'S OFFICE
                               Eastern District of New York
13                             271 Cadman Plaza East
                               Brooklyn, New York 11201
14                             BY:  ANDREY SPEKTOR, AUSA
                                    LINDSAY GERDES, AUSA

15

16  For the Defendant:         MITCHELL J. DINNERSTEIN, ESQ.
                               The Trinity Building
17                             111 Broadway, Suite 1305
                               New York, New York 10006

18

19

20  Court Reporter:            Georgette K. Betts, RPR, CSR, OCR
                               Phone:  (718)804-2777
21                             Fax:    (718)804-2795
                               Email:  Georgetteb25@gmail.com

22

23

    Proceedings recorded by mechanical stenography.  Transcript
24  produced by computer-aided transcription.

25

*GEORGETTE K. BETTS, RPR, CSR*
*Official Court Reporter*

1    THE COURTROOM DEPUTY:  Criminal cause for

2  sentencing, United States versus Michael Young, docket number

3  16-CR-617.

4    Counsel, state your appearances starting with the

5  government.

6    MR. SPEKTOR:  Good morning, Your Honor, Andrey

7  Spektor and Lindsay Gerdes for the United States.

8    THE COURT:  Good morning.

9    THE PROBATION OFFICER:  Good morning, Kristen

10  McKeown, Probation.

11    THE COURT:  Good morning.

12    MR. DINNERSTEIN:  Hi, good morning, Mitchell

13  Dinnerstein, D-I-N-N-E-R-S-T-E-I-N for Mr. Young, who is

14  before the Court.

15    THE COURT:  Good morning.  Good morning, Mr. Young.

16    THE DEFENDANT:  Good morning.

17    THE COURT:  We're on for sentencing.  Let me first

18  determine if I'm going to accept the guilty plea that

19  Mr. Young gave to Magistrate Judge Orenstein.

20    I have reviewed the transcript of that plea.

21  Mr. Young, is it still your desire to plead guilty?

22    THE DEFENDANT:  Yes, yes.

23    THE COURT:  Is everything that you told the

24  magistrate judge on that date true?

25    THE DEFENDANT:  Yes.

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

1    THE COURT:  Mr. Dinnerstein, do you know of any

2 reason why I should not accept the guilty plea?

3    MR. DINNERSTEIN:  None, Your Honor.

4    THE COURT:  Having heard counsel and the defendant's

5 answers to my questions and having reviewed the transcript of

6 the plea, I find the defendant is pleading guilty knowingly

7 and voluntarily and understands his rights and the

8 consequences of his plea and that there is a factual basis for

9 the plea.  I, therefore, accept the plea of guilty.

10    Let me go through with you, Mr. Young, the documents

11 I have reviewed in preparing for the sentencing.  I believe

12 you have seen all of these but if you haven't let me know and

13 we'll take a break so you can go over them with your attorney,

14 okay?

15    THE DEFENDANT:  Yes.

16    THE COURT:  I will start with the Presentence

17 Investigation Report that's from September 18th of this year.

18 There was one addendum to that report that is curiously

19 undated but came in fairly recently.  In addition to that, I

20 have a sentencing memorandum from Mr. Dinnerstein with

21 exhibits annexed to it, that is also undated but received in

22 my chambers on November 27th.  I have a follow-up letter from

23 Mr. Dinnerstein of November 29th clarifying some things about

24 the plea agreement and the guideline range and then I have a

25 sentencing memorandum from the government that's dated

1  November 30th.

2          Anything else I need to be looking at?  I have

3  Mr. Young's letter, of course it's exhibited to the sentencing

4  memorandum.

5          MR. DINNERSTEIN:  Your Honor, I would just say that

6  the original sentencing memorandum is dated for me

7  November 21st.  That's on the second page.

8          THE COURT:  You are correct, my apologies.

9          MR. DINNERSTEIN:  That's okay.

10          THE COURT:  Mr. Young, you're familiar with all

11  those documents?

12          THE DEFENDANT:  Yes, sir.

13          THE COURT:  Let's talk next about the facts that are

14  going to control this sentencing.  Based on the parties'

15  submissions, I don't think there's any dispute about the

16  description of the offense and the offender characteristics in

17  the PSR; is that correct?

18          MR. SPEKTOR:  That's correct, Your Honor.

19          MR. DINNERSTEIN:  That's right, Judge.

20          THE COURT:  I will adopt those portions of Section A

21  and C that describe the offense and the offender

22  characteristics as my findings of fact for purposes of the

23  sentencing.

24          Let's next talk about the guidelines, which are of

25  course merely advisory and only one factor that I am to

1    consider in determining the appropriate sentence.  I must say

2    I'm a little bit confused as to the parties' positions on the

3    guidelines.  Let me summarize what I understand and then you

4    all tell me if I'm wrong.

5            I think there is agreement that we're talking about

6    an offense level of 28 and a Criminal History Category of VI,

7    which would make Mr. Young a career offender and that would

8    give a guideline range of 140 to 175.  I think technically the

9    parties agree that's the way the guidelines work out.  But as

10   I understand it, they have also jointly said to me that's too

11   high, you should not consider that to be the guidelines.  You

12   should be looking more in the 77 to 96 month range as a

13   guideline range for an appropriate sentence here.

14           Have I said it correctly?

15           MR. SPEKTOR:  I think that's essentially right,

16   Judge.  The one, I guess, technical correction is because he's

17   a career offender he started at base offense level 32 and then

18   we get to 28.  And, again, because he's a career offender

19   Criminal History VI applies, but again we all agree that both

20   the criminal history and the base offense level are overstated

21   and we're jointly asking for a 76 to 96 month range to apply.

22           THE COURT:  That's fine.  But there is a document I

23   have to fill out when I do the judgment that you all don't see

24   called the Statement of Reasons and the statement has to have

25   the calculation of the guideline range.  I have no problem

1  with the parties' agreement to 77 to 96 as the starting point

2  for me to determine the sentence, that's fine, but

3  technically, as a technical matter, I do think we're talking

4  about an adjusted offense level of 28, right?

5          MR. SPEKTOR:  That's right.

6          THE COURT:  And then the criminal history and career

7  offender kicks it up to Category VI, which means 140 to 175

8  months.  So that's what I put on the form because that is

9  technically correct, that's my finding as to the guidelines.

10  I accept the parties' mutually expressed view that that's much

11  too high and I shouldn't be considering that range.  It seems

12  much too high to me too and that the appropriate range for me

13  to be considering is 77 to 96, which leaves only one

14  ambiguity, which is under your plea agreement, what I'm

15  picking up from Mr. Dinnerstein is he's looking for a downward

16  variance.  Is that the case and, if it is the case, is it

17  allowed under the plea agreement?

18          MR. SPEKTOR:  It's not allowed under the plea

19  agreement.  I think the plea agreement says that we're jointly

20  asking for a range between 76 and 96 months.

21          The way I read Mr. Dinnerstein's letter is that it

22  said -- and obviously the Court is not bound by our agreement

23  which is sort of a wink and a nod to the Court, obviously he's

24  not allowed to advocate for anything lower and we don't think

25  anything lower is appropriate.

1          THE COURT:  Okay.  Is that a clear statement,

2   Mr. Dinnerstein?

3          MR. DINNERSTEIN:  Your Honor, I kind of get to where

4   we are slightly differently.  Because both of us agreed, as

5   the Probation Department did, I believe it's 4B1.3(3) applies.

6   So instead of him being under those circumstances where 4B1.3

7   applies, instead of him being a career offender or Criminal

8   History Category VI, he should be construed going in as a

9   Category V, because that's what we agreed to, that was part of

10  the agreement.

11         Now I agree with you that it is technical because I

12  think we still get to the same 77 to 96 months that way, but

13  we start there and, therefore, this Court of course can take

14  into consideration 3553(a) factors starting there instead of

15  starting at 140 to 175.  So that's why I made a point of this.

16         Also, it's my understanding that an individual in

17  Category V can get a two-level reduction for a minor role in

18  the offense, which we also both agreed to, that he should have

19  gotten the minor role in the offense.  The government's

20  position is if he's in Category VI he can't get a two-level

21  reduction for a minor role.

22         THE COURT:  But I think we're kind of in angels

23  dancing on the head of a pin land.  If the technically correct

24  guidelines are 140 to 175 months, I'm not going to mess with

25  them in terms of what departures might be appropriate under

1    the guidelines.  There is no reason for me to do that.

2              MR. DINNERSTEIN:  Well --

3              THE COURT:  I'm going to vary.  I don't know if

4    there's any amount of downward departure that would

5    legitimately get me to 77 to 96, but there is legitimately a

6    variance that I could use to do that.  So that's the way I'm

7    approaching it.  I think that's the only thing that makes

8    sense.  Because like you said in your letter, well, if I start

9    thinking did the criminal history get overstated, I can only

10   take him down one level to Category V and I don't see anything

11   to mess around with that when we're all agreed that the 140 to

12   175 is much too high and the appropriate range for me to use

13   as a starting point is 77 to 96.

14             MR. DINNERSTEIN:  I agree with you.  I guess part of

15   that is I'm -- I see two issues here that I just wanted to

16   address with the Court, which I did in the papers.

17             One deals with the idea that the youthful offender

18   adjudication counts for career offender purposes.  This case

19   the guy got a four-month sentencing and then because he had a

20   violation of probation that ran concurrently with another

21   case, it put it at 14 months and therefore counts.  Which I

22   think is just -- I'm just in a way bitching, Your Honor.

23             THE COURT:  I understand.  I got that.  But I think

24   you're barking up the wrong tree.  Those would be good

25   arguments if you were trying to persuade me why 140 to 175

1    months is too high.

2         MR. DINNERSTEIN:  You're right.

3         THE COURT:  You should weigh the guidelines lightly,

4    Judge, because look at these mitigating factors that

5    contributed to them, but we know they're too high.

6         MR. DINNERSTEIN:  The other thing was I wanted to

7    give you a pat on the back for your U.S.A. versus Terrence

8    Williams decision, which was a pre-*Beckels* decision which

9    frankly, in my opinion, makes a heck of a lot more sense than

10   what the Supreme Court did, so I just wanted to mention that.

11        THE COURT:  I appreciate that.

12        In any event, I still have an open question for you

13   which is, as I understand the plea agreement, you are not

14   allowed to argue that 77 to 96 is too high and I ought to go

15   below that.  You can of course remind me of the fact that

16   where I sentence him is entirely up to me.

17        I understand that to be your position, am I right?

18        MR. DINNERSTEIN:  Absolutely, Judge.

19        THE COURT:  So the government does not consider

20   anything that Mr. Dinnerstein has said as constituting a

21   breach of the plea agreement, right?

22        MR. SPEKTOR:  That's right, Your Honor.

23        THE COURT:  So that's my finding on the guideline

24   and, secondarily, that's how I am generally approaching this

25   case is the 77 to 96 right, or do I on my own feel the 3553(a)

1   factors which suggest something lower.  Okay, good.

2           Let me then hear from all the parties on those

3   3553(a) factors, I'll start with you, Mr. Dinnerstein.

4           MR. DINNERSTEIN:  Michael Young is now 33-years old,

5   his criminal history category, which we just discussed, was

6   driven by misconduct that occurred more than 10 years ago,

7   some more than 15 years ago when he was a teenager.  He's not

8   that person now, but --

9           THE COURT:  This is a worse crime now, isn't it?

10  Isn't this a worse crime than when he was a teenager?

11          MR. DINNERSTEIN:  Is it what?

12          THE COURT:  Is it worse, is it more egregious?

13          MR. DINNERSTEIN:  Well, I think maturity makes a

14  difference and that's what I'm talking about.  The fact that

15  those crimes were committed when he was a teenager --

16          THE COURT:  But I'm asking you a different question.

17          MR. DINNERSTEIN:  -- he may have outgrown.  It's not

18  only about youth --

19          THE COURT:  I'm asking you, has he not graduated to

20  a higher level of criminal activity by this conviction?

21          MR. DINNERSTEIN:  I understand what you're saying,

22  Your Honor, and I think that's not the case.  I think what

23  this is is a person who has a drug problem, had a drug

24  problem.  Who is a small-time drug dealer in the community

25  that he lives in.  There's nothing to defend that, but that's

1    what this case is about.

2              The government has acknowledged that he was a minor

3    role player in this and that is also of course of

4    significance.

5              Now just I believe this week Your Honor sentenced

6    Mr. Carrillo to 126 months and that there was a forfeiture

7    order that was for $150,000 plus numerous guns that were

8    apparently recovered in his apartment, I don't know exactly

9    where they were recovered.

10             THE COURT:  If you're making the point that

11   Mr. Young compares favorably with Mr. Carrillo, I agree with

12   you.

13             MR. DINNERSTEIN:  Right.  Michael's forfeiture order

14   is $1440, which is less than 100th of that.

15             There is also clearly no accusation that he ever

16   acted violently, I think that's also a positive factor in

17   terms of response to your question whether he's graduating

18   upwards.

19             I want to talk a little bit about what the

20   government said in its memo that acknowledges the Queensbridge

21   as the largest public housing complex in the country.  In

22   fact, it has 29 buildings, it has 96 units per building, has

23   over 7,000 people, and in 1939 when it was built there was a

24   policy that poor people and only poor people should live

25   there.  Also, it happened that more than 98 percent of the

1    people were either black or Latino who lived there.  That's

2    hardly a good thing.

3          Today, in a more enlightened world dealing with

4    housing policy, these huge housing projects first aren't built

5    and certainly the idea of segregating poor people has been

6    determined to be a bad idea.  It is a much better idea since

7    the housing policy today that rich people, poor people, middle

8    class people all live together, it creates a sense of

9    community and that's really a good thing.

10          Where Queensbridge is and -- now it's actually

11   better but in the '90s and in the 2000s when Michael was

12   growing up, it was a very dangerous place.  And, hopefully,

13   today housing projects in these sorts of places are run

14   better.  In fact, we know, based on crime statistics, that

15   crime is down and that we hope that the residents who live

16   here, who live in those places have hope that they can

17   actually get beyond it.  So we hope and I hope that

18   Queensbridge is anachronism of the past and it was a bad and

19   ineffective housing policy.

20          Now Michael grew up in that project and as a

21   teenager he lived a street life.  He got involved in drugs.

22   His father, who is not around, when he was around was abusive

23   towards him.  In school he did not -- was not a good student.

24   He was in Special Ed. classes.  He was immature and he was

25   involved with what occurred on the streets in the '90s and the

1    2000s.  That's in fact the reason why what drives this case is

2    his criminal activity back 10, 15 years ago.  Maybe he saw,

3    and it wouldn't be surprising, that there was little hope for

4    him of having a really good life.  He wound up committing

5    those crimes and he wound up going to jail back then.

6         Now I looked up a little bit about Queensbridge and

7    back then all the people who have, quote, made it in

8    Queensbridge, they're not educators, they're not people who

9    did well in school.  There's two types of people who made it,

10   apparently.  People who are rappers, who are involved in the

11   music industry and people who play basketball.  There are

12   several basketball players who are now in the NBA who grew up

13   in Queensbridge.  That takes a particular talent that Michael

14   did not have, and I think that's a factor.

15        But I also think he's now 33, he's not 20 and he's

16   grown up and it's not the person that he is today who in a

17   sense is going to be sentenced because of these guidelines and

18   because of his Criminal History Category.

19        His mom is here in Court, she's the woman in pink

20   over there.

21        THE COURT:  Thank you for coming.

22        MR. DINNERSTEIN:  She needed an Access-A-Ride to get

23   here, she walks with a walker.  She lives in Queensbridge,

24   she's lived there for her whole life.  She has a real

25   relationship with Michael.  If you read her letter, this is

1    Exhibit 1, she talks about that he's a good kid, that he's

2    been good to her and that she actually writes a second letter

3    saying that she hopes when you sentence him, you sentence him

4    to a place relatively close so she can get an Access-A-Ride or

5    however she would travel and she would go visit him.  It's my

6    understanding that's how she visits him at the MDC where he's

7    presently being housed.

8              She needs him, she loves him.  He needs her, he

9    loves her.  That's how people get beyond criminal activity, I

10   think, by having relationships that matter.

11             His girlfriend is the woman in the middle over

12   there, she's Crystal.  He has children not with her, but he

13   cares for her children.  She writes that in her letter, which

14   I believe is Exhibit 3.  I'm sure you read it.

15             THE COURT:  Yes.

16             MR. DINNERSTEIN:  And Michael cares for those

17   children and helps her take care of them when he was out on

18   the street.  He also has two other children and there is

19   another letter there, it's not a letter that shows necessarily

20   much affection towards him, but it's a recognition that they

21   messed up in the past, her and Michael, and that she wants to

22   get beyond that.  She doesn't want it to be held against him

23   when he's punished today, and that he's also a good father to

24   their child.  That's the criminal complaint case that was from

25   2013.

1           THE COURT:  Yes.

2           MR. DINNERSTEIN:  And Michael also writes to the

3    Court.  He knows he must get a handle on his drug problems and

4    he hopes, frankly, when he goes -- and I'm not asking for time

5    served, when he goes to prison that he gets into a drug

6    program, that the Court acknowledges a need for that, and that

7    he also understands he needs to obtain a skill and gets some

8    better education.  Whatever his educational limitations are,

9    he's still understands he needs to get educated.

10           Now I think as a teenager Michael was directionless,

11    but he says in his letter, and I think it's quite insightful,

12    that he has no illusions that this will not be easy.  He

13    simply now asks for a reasonable chance and reasonable time to

14    contribute to his community, which he mentions, and to support

15    his children.

16           So you have the difficult job that's I guess why

17    they give you the robes, but what's an appropriate sentence

18    using all the 3553(a) factors, that's for you to decide.

19           Carmichael, who also was a person who was described

20    had a minor role in this offense received a 51-month sentence.

21    That's maybe appropriate.  Michael, I think, and I don't know

22    about Carmichael, but I know that Michael now recognizes that

23    he has responsibilities for his children, for Crystal's

24    children and for his mother and he hopes that he'll have a

25    chance to get out there and act responsibly and show the Court

1    that he really does want to be a decent member of our

2    community.

3           In a sense -- and I find this all troubling and,

4    frankly, I find it troubling because of how the U.S.

5    Sentencing Guidelines work, that incidents that happened long

6    ago when a person was different still is affected in the same

7    way as something that happened this week or this month or this

8    year.  That to me doesn't make sense from a sentencing

9    perspective.  And the person today, this 33-year old man is

10   not that 16-year old kid or 18-year old kid who did those

11   criminal acts 15 years ago.  So I ask you to take that into

12   consideration.

13          Your Honor, the government did provide a B1C plea so

14   there is no mandatory minimum in this case and it's your job

15   totally, you have absolute discretion to do justice.  I ask

16   you to do that wisely.  Thank you.

17          THE COURT:  Thank you, Mr. Dinnerstein.

18          Mr. Young, I've read your letter but if you'd like

19   to say anything or amplify on the letter or anything else you

20   want to say I'm happy to hear it.

21          THE DEFENDANT:  No, sir.

22          THE COURT:  Thank you.

23          I'll hear from the government.

24          MR. SPEKTOR:  Your Honor, just very briefly.

25   Mr. Dinnerstein talked about how Queensbridge is improving,

1    and I hope that's true, but the defendant's conduct doesn't

2    help matters in Queensbridge selling drugs.  And I do

3    recognize that, you know, if he was not a career offender he

4    would get the benefit of the minor role adjustment.  There are

5    four defendants in this case who are similarly situated in

6    that regard.  They are basically street sellers and I think

7    that's what Mr. Young is.

8            He certainly compares favorably in terms of conduct

9    to Mr. Carrillo.  He is similar to Mr. Carmichael.  I know

10   that the Second Circuit has cautioned District Courts not to

11   calibrate sentences to co-defendants, but to the extent it's

12   helpful to the Court, you know, Mr. Young sold a lot more to a

13   confidential source.  He sold 32 grams just to an undercover

14   buys which alone would get him over the 28-gram threshold that

15   we use to charge individuals over the five-year mandatory

16   minimum.  We did give me a zero to 20, I think that's in

17   recognition to his minor role.  He's not living the life that

18   Mr. Carrillo was certainly.  But when you're comparing him to

19   other co-defendants who are like him, street sellers, he

20   doesn't compare favorably not just in terms of volume but in

21   terms of his record.  I think only Mr. Williams has arguably a

22   worse record.

23           What troubles us about Mr. Young is that he has a

24   mix of violent criminal history, even though he's a bit older,

25   he has more recent drug convictions.  He's gotten lenient

1  sentences for some of those convictions.  He's gotten

2  treatment, he's completed treatment and yet it hasn't really

3  deterred him in any way.  So I think for those reasons a

4  sentence within the range of 77 to 96 months is appropriate.

5          THE COURT:  I've considered all the factors under

6  3553(a) including the advisory guidelines as we have all

7  agreed they should be viewed in this case, so I'm not really

8  even looking at the technically correct guidelines.  What I am

9  wrestling with is the 77 to 96 range the least amount of time

10  necessary to accomplish the purposes of 3553(a).  It's a

11  mitigating factor to me in looking at Mr. Young's history and

12  characteristics that he just never had much going for him and

13  I think in the environment he was growing up in there just

14  weren't many ways for him to go.

15          I agree with Mr. Dinnerstein, I don't know whose

16  idea it was to lock people in these mega projects and not

17  realize what could result from that, but opportunity is not

18  something that Mr. Young had.  I also tend to agree with

19  Mr. Dinnerstein that the worst of the criminal acts occurred

20  when he was younger and presumably more reckless.  But also

21  the point I was trying to make in terms of evaluating the

22  seriousness of the crime and the circumstances of the offense,

23  is that participating as a street dealer in a case like this

24  is, in fact, very serious and in some ways more serious than

25  any of the things he did as a teenager.

1          I really appreciate the family support that he has

2     and when I take that into account I have to think about what

3     happens to all the families who he sells to, the family

4     members who are addicted to these drugs, what happens to their

5     families.  And I think in terms of general deterrence, it's

6     very important to send a message that you can't support

7     yourself or your own children by selling poison to other

8     people and their children.

9          In terms of specific deterrents, I think there is a

10    need because, as I said, Mr. Young just hasn't had a lot going

11    on for him.  I don't know, as I sit here, where he's going to

12    go when he gets out.  But I think there's a real risk, based

13    on his history and based on the magnitude of this crime, that

14    he again searches for what to him may be the easiest way if

15    not the only way.

16         Certainly even the middle or the high end of the

17    adjusted guideline range that we discussed is not necessary

18    here.  What I'm struggling with is whether the 77 or something

19    less than 77 might do it.  What gives me pause on that

20    question is that while he was much younger, I don't really

21    understand how this happened, maybe you can explain it,

22    Mr. Dinnerstein, in paragraph 40 of the PSR when he was

23    convicted for second degree assault during a felony he was

24    sentenced to three years but he didn't get released to parole

25    until 2009, so it looks like he did like five years.

1              How does that happen?

2              MR. DINNERSTEIN:  My understanding, after speaking

3    with him, is that he was released in 2007.

4              THE COURT:  I see.

5              MR. DINNERSTEIN:  And not 2009.  That's what he

6    says.

7              THE COURT:  Okay.  Does probation think maybe that's

8    an error?

9              THE PROBATION OFFICER:  Let me look through my

10   records, Your Honor.

11             THE COURT:  It doesn't look right that he's arrested

12   in 2004, he's sentenced in 2005, then he's paroled in 2009 on

13   a three-year sentence.  Something doesn't fit there.  The

14   reason I'm looking at this because it doesn't look like he's

15   ever served more than three years, probably less than that.

16             MR. DINNERSTEIN:  My understanding, Your Honor, if I

17   can try to explain this to you, is that he was released

18   originally in 2007.  He was violated in 2009, apparently

19   for -- there was something going on in the housing projects at

20   that time that he's not supposed to return back to the housing

21   projects to live and he was -- he didn't have an address at

22   some point, so he was incarcerated again because he couldn't

23   provide the parole department with an address.  And that

24   occurred a second time for basically the same thing.  His

25   violations had to do with not being able to provide them with

1    an adequate address.

2             THE COURT:  Right, he's got three violations from

3    that conviction but when they put him back they didn't have

4    him serve any more than a couple of months, two or three

5    months.

6             MR. DINNERSTEIN:  That's right.  Then they toss him

7    back out on the street and he's got to find a place to live.

8             THE PROBATION OFFICER:  Your Honor, I'm sorry, that

9    is a typo.  The date of release to parole should be June 4th,

10   2007.

11            THE COURT:  Now it makes sense.  It's good that we

12   clarified that because it's one thing for me to look at

13   somebody who served five years in jail and determine how much

14   it takes to specifically deter him, and somebody who served a

15   couple of years here, a couple of months there, it's very

16   different going away for as long as Mr. Young is going to this

17   time.

18            Well, in light of that and all the other

19   considerations that I've articulated, I don't think it's

20   necessary to be within the 77 to 96 month range.  I think a

21   sentence, given the nature of his history of 63 months is

22   sufficient to accomplish all of the purposes of sentencing and

23   that therefore will be my sentence.  Sixty-three months

24   custody.  I will of course recommend that he be assigned to a

25   facility as close to New York as possible.  I will also impose

1    three years of supervised release, which will require him to

2    comply with the order of forfeiture, which I think I signed.

3              MR. SPEKTOR:  Yes, Your Honor.

4              THE COURT:  He is not permitted to associate -- and

5    this is a tough one, Mr. Young, you have to be very careful

6    about this.  You're not permitted to associate whether in

7    person, mail, email, texting with anybody who is in any

8    organized crime groups.  I didn't hold this against him

9    because it was only mentioned once in one of the convictions

10   that at some point they identified him with a street gang.

11   You're not allowed to have any contact with anybody in that

12   gang.  Probation is going to give you a list of people you

13   can't have contact with and you've got to stick to that or

14   it's a violation and a violation here is different than the

15   violations you may have experienced from your state court

16   convictions, it can mean years in jail not a couple of months.

17              Now, in addition, I want him to participate in

18   out-patient drug treatment as prescribed by probation.  He's

19   got to pay for that to the extent he can.  If he can't, which

20   I expect he can't then he doesn't have to.  He's got to stay

21   completely beyond sober.  He's not allowed to have any alcohol

22   or any other illegal drug or intoxicant unless it's pursuant

23   to a doctor's prescription.  And he's going to be randomly

24   tested.  They're going to show up at your house and they're

25   say give us a urine sample.  Again, if you fail it could be

1    years.

2            In addition, when he gets out for a period of six

3    months as a condition of his supervised release he'll be on

4    curfew from 7:00 p.m. to 7:00 a.m. electronic monitoring which

5    he'll pay for if he can and he won't if he can't.

6            And then I'm also going to impose a search

7    condition, which means, Mr. Young, that if the Probation

8    Department has a reasonable suspicion that you're possessing

9    contraband or engaged in illegal activity, they can enter your

10   house, even if it is not your house, any place you're living,

11   any car you have access to, any place you have access to, to

12   do a search to see if you are violating any laws.  And they'll

13   have to conduct that search in a reasonable time, place and

14   manner.

15           I'm not going to impose a fine because I know he

16   can't afford it.  I will impose a 100-dollar special

17   assessment.

18           Anything further before I advise him of his

19   appellate rights which I assume were waived in the plea

20   agreement.

21           MR. SPEKTOR:  They were waived, Your Honor.  Just

22   one thing for the record, the matter of separation which was

23   bought up at the last sentencing.  As Your Honor directed, we

24   did contact the BOP, we've asked them to expedite the

25   designation and they said they'll do that as long as we

1    forward the judgment, which we have already for the prior two

2    cases and we'll do that for this one as well.

3              THE COURT:  Great.  That also reminds me, any open

4    counts?

5              MR. SPEKTOR:  There are no open counts at this time.

6              MR. DINNERSTEIN:  Your Honor, there is one other

7    matter I would ask you to consider and that is also inpatient

8    drug program at the facility that he gets sent to.  I don't

9    think you can order it but I think you can make an

10   recommendation.

11             THE COURT:  I actually think I can order it.  Do the

12   parties think I can't order it?  I think what I can't do is

13   leave it to probation to determine whether it's inpatient or

14   out-patient, but I can order inpatient treatment and certainly

15   if he's asking for it I can order it.

16             MR. DINNERSTEIN:  He is asking for it.

17             THE COURT:  What does probation think about that?

18             THE PROBATION OFFICER:  Your Honor, I believe you

19   can order it, yes, that's correct, while he's in custody.

20             THE COURT:  I will modify the drug treatment that

21   I've conditioned as part of supervised release to require

22   inpatient drug treatment at a program to be selected by

23   probation and I will also recommend to the BOP that he have

24   the RDAP or whatever the equivalent maximum program is while

25   he's in custody, so hopefully that will do some good.  All

1    right.

2            Mr. Young, by signing on to your plea agreement you

3    waived your right to appeal your conviction and the sentence I

4    just imposed, but if you think there was something

5    fundamentally wrong with either of those things or the events

6    leading up to them, you could attempt to appeal.  To do that

7    you have to get what's known as a notice of appeal filed in 14

8    days.  Mr. Dinnerstein will do that for you if you ask him.

9    You can ask the Clerk of the Court by certifying you can't

10   afford a lawyer and the clerk will do it for you, or you can

11   get from the MDC library the form of a notice of appeal and

12   file it here yourself.  But please keep in mind, if you do

13   want to file that notice no matter how you delegate it it

14   remains your responsibility to see to it that it gets filed in

15   14 days or you will have irrevocably waived any right you

16   might have for appeal.

17           Anything further?

18           MR. SPEKTOR:  Not from the government.

19           MR. DINNERSTEIN:  Nothing, Your Honor, thank you.

20           THE COURT:  We're adjourned.

21           (Matter concluded.)

22                     *    *    *    *    *
     I certify that the foregoing is a correct transcript from the
23   record of proceedings in the above-entitled matter.

24   s/ Georgette K. Betts                January 25, 2018

25   GEORGETTE K. BETTS                   DATE

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter